726 So.2d 804 (1999)
Ryan Christopher HARRIS, Appellant,
v.
STATE of Florida, Appellee.
No. 97-1449
District Court of Appeal of Florida, Fourth District.
January 20, 1999.
Rehearing Denied March 3, 1999.
Ronald B. Smith of Waxler & Smith, Stuart, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Barbra Amron Weisberg, Assistant Attorney General, West Palm Beach, for appellee.
FARMER, J.
Defendant was convicted of second degree murder and sentenced to life in prison. We conclude that the trial court erred in permitting the prosecution to present testimony and argument relating to his constitutional right to remain silent.
Defendant and the victim were previously involved in a relationship which produced one *805 child. At the time of the incident, defendant was estranged from the victim, who had custody of their infant daughter. On the night of the events in suit, defendant and the codefendant, Kevin Cutts, went to the victim's home where Cutts shot the victim twelve times. The dead mother was found with the live baby a few feet away from her body. Both defendant and Cutts were later charged with murder. Cutts pleaded guilty and received a favorable sentence in return for his testimony against defendant.
At trial, the state introduced evidence and commented in closing argument about the defendant's failure to inquire about his baby daughter when he was first approached by the police. Other comments and evidence concerned the defendant's failure to tell police that Cutts gave the gun to defendant for hiding where it was found or that Cutts alone did the killing. Defendant objected at all proper times and moved for a mistrial, all of which the court denied. On appeal, defendant argues that the testimony and comments violated his constitutional right to remain silent.
In State v. Hoggins, 718 So.2d 761, 768, 772 (Fla.1998), the Florida Supreme Court held that a comment on a defendant's silence after arrest is a violation of the defendant's right to remain silent as protected by the Florida Constitution.[1] Under Hoggins, any reference, either through testimony or in argument, to a defendant's exercise of silence after the arrest is impermissible.
The state contends that the subject remarks did not violate his right to remain silent because all such remarks dealt with the time before he was actually under arrest. The record suggests otherwise. While some of the evidence and remarks refer to the defendant's silence when he was first taken into custody for interrogation on the day before he was formally charged with the crime, some plainly concerned his failure to speak after he was formally charged. We conclude that these comments on silence during a custodial interrogation before Miranda warnings were given constitute harmful error.
It is true that Hoggins is limited by its express terms to silence after the arrest and does not apply to pre-arrest silence. We think the right of silence is applicable in this case to the prosecutor's comments about his failure to speak because defendant was taken into custody by the police and questioned at the police station before the administration of the Miranda caution. Defendant was not questioned at home or on the street or in his lawyer's office. Police had just come from the family of the victim where they had learned that defendant and the victim were estranged and that he was likely involved in her murder. After stating that they were investigating the murder of the victim, they informed defendant that they wanted to question him at the police station. In the words of the police officer, "we needed him to come down to the Sheriff's office and talk with us." The officer who was sent to defendant's home said that he was directed "to bring him to the Sheriff's office." When defendant's mother asked instead to drive him "downtown" for the questioning, the officer responded "we would not be able to do that; that [defendant] would have to ride with us."
This was undoubtedly not a mere hope or wish on the part of the police that he would happily and willingly join them "downtown." It is obvious from the record that he was not free just to leave the police and go about his business. Indeed, to a specific question from counsel the officer frankly stated that defendant was not free to leave the residence. This was indisputably a custodial interrogation in the police precinct. He was clearly arrested. He may not have been charged with the murder at that moment, but he was just as arrested. The fact that it was not Lefortovo Prison or the Bastille to which he was taken does not make it any less a custodial police interrogation.
Custodial interrogations are different. The fact that the police have taken a person into custody to interrogate him in the friendlier (to the police, anyway) air of the constabularial confines cannot possibly be lost on the detainee. By bringing the one to be *806 questioned to the place where confinement is so pointedly its purpose, the police hope to use its intimidating atmosphere to loosen the tongue of the detainee.
"An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery."
Miranda v. Arizona, 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The very point of Miranda was to require a cautionary warning before police could use incriminating statements emerging from a custodial interrogation against an accused. It would be a strange construction of it to hold that police may simply not give the warning when it is required by Miranda to be given and then argue that a comment on the accused's failure to speak is permissible simply because it occurred before the required Miranda warnings were actually given.
Because of the reversal on this issue pertaining to the right of silence, we need not necessarily decide the defendant's remaining issues on appeal. Nevertheless one issue merits a brief word of caution. At trial the state's theory of guilt was that defendant wanted to kill the victim because that would be his only means of getting custody of his child. The state's evidence showed that Cutts shot the victim while defendant was present. In defense, defendant testified that Cutts killed the victim for his own purposes, mainly out of a morbid fascination with death and had spoken of it previously. The trial judge barred defendant from questioning Cutts on this alleged fascination with death, ruling that the information sought was either consistent with his prior testimony or irrelevant.
We do not think this proposed testimony would necessarily have been either irrelevant or duplicative. It is fundamental that "a wide range of cross-examination is usually allowed of the state's witnesses." Auchmuty v. State, 594 So.2d 859, 860 (Fla. 4th DCA 1992). A defendant has a strong interest in discrediting adverse witnesses by showing bias, an interest in the outcome, or some ulterior motive. Id. Trial courts should exercise caution in limiting defense cross-examination of a crucial state's witness as to a possible motive to testify against him. And of course one of the strongest bases for cross-examination is to show that a codefendant is actually responsible for the crime and not the defendant. Hence the subject matter of the limitation on cross-examination in this case went to the very core of the defense. In this circumstance, on retrial the trial judge should be careful about tying the hands of defense counsel on cross-examination as the trial court did in this first trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
POLEN and TAYLOR, JJ., concur.
NOTES
[1] See Art. 1, § 9, Fla. Const.